

FILED BY _____ D.C.

SEP 2 0 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA     )
ex rel. AMBERLY LUSTGARTEN,     )
                           )
     Plaintiff-Relator,        )

21-81782-CV-CANNON/BER

                           )
v.                         )  **JURY TRIAL DEMANDED**
                           )
BOLT *RX* LLC; SEAN DOUGHERTY;  )  **FILED *IN CAMERA* AND**
DOUBLE DOWN DATA LLC;      )  **UNDER SEAL PURSUANT TO**
ANTHONY MISCIOSCIA;       )  **31 U.S.C. § 3730(b)(2)**
ALL ELITE MEDICAL SUPPLIES LLC; )
MARIO GEORGATOS; REALTIME   )
PHYSICIANS LLC,            )
                           )
     Defendants.            )

## COMPLAINT

1.    Relator Amberly Lustgarten brings this action on behalf of herself and

the United States of America against Defendants Bolt Rx LLC; Sean

Dougherty; Double Down Data LLC; Anthony Miscioscia; All Elite Medical

Supplies LLC; Mario Georgatos; and Realtime Physicians LLC, for violations

of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

2.    Defendants jointly conspired to cold call Medicare patients to market—

and bill Medicare for—Durable Medical Equipment ("DME") that they

neither wanted nor needed.

### JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 31 U.S.C. §



3732(a) and 28 U.S.C. §§ 1331, 1345.

4.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31

U.S.C. § 3732(a), as Defendants transact business in this jurisdiction and

violations of the False Claims Act described herein occurred in this district.

## GOVERNMENT HEALTHCARE PROGRAMS

5.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,*

establishes the Health Insurance for the Aged and Disabled Program, also

known as Medicare. The United States Department of Health and Human

Services ("HHS") administers the Medicare Program through the Centers for

Medicare and Medicaid Services ("CMS").

6.      The Medicare program is comprised of four parts. Medicare Part A

provides basic insurance for the costs of hospitalization and post-

hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B covers medical

services and equipment such as outpatient care, medical supplies, and

laboratory services. 42 U.S.C. §§ 1395j-w-5. Separate payments are made for

each Current Procedures Terminology ("CPT") and Healthcare Common

Procedure Coding System ("HCPCS") code listed on the Medicare Part B

claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the HCPCS

as maintained and distributed by HHS, and the Current Procedural

Terminology Coding Manual published by the American Medical Association

(the "CPT Manual"). Medicare Part C, also known as Medicare Advantage, is

a plan offered by private insurers that contract with Medicare to provide Part

A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D is a plan

offered by private insurers approved by Medicare to provide basic insurance

for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

7.      Reimbursement for Medicare Part B claims is made by the United

States through CMS. CMS, in turn, contracts with fiscal intermediaries to

administer and pay Medicare Part B claims from the Medicare Trust Fund.

42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of

CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT

procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§

162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology

Coding Manual published by the American Medical Association (the "CPT

Manual").

8.      Reimbursement for Medicare Part C claims is made by the United

States through CMS. CMS makes fixed monthly payments to each Medicare

Choice organization for each enrolled individual, i.e., a capitated payment.

9.      Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.,*

establishes the Medicaid program, a federally assisted grant program for the

States. Medicaid enables the States to provide medical assistance and related

services to needy individuals. Within broad federal rules, each state decides

who is eligible for Medicaid, the services covered, payment levels for services

and administrative and operational procedures.

10.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

11.     Together, the programs described above, and any other government-funded healthcare programs, are referred to as "Government Healthcare Programs."

12.     A Government Healthcare Program may act as a primary payer or a "secondary payer," meaning that it will pay costs that the primary payer does not, including deductibles and copayments.

## SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

13.     Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service or item provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are

not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme.").

14.     Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3).

15.     These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000). Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *U.S. ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

16.    Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

17.    Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State

health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

18.    For these reasons, courts have routinely held that the medical necessity requirement is material under the False Claims Act. *See, e.g., Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.,* 953 F.3d 1108, 1122 (9th Cir. 2020).

## PARTIES

19.    Defendant Bolt Rx LLC ("Bolt Rx") is a Durable Medical Equipment ("DME") and Medical Supplies Supplier with a NPI number of 1770118317.

20.    Bolt Rx's mailing address is 6245 N Federal Hwy., Ste 303, Fort Lauderdale, Florida 33308-1915.

21.     Bolt Rx's principal is Defendant Sean Dougherty.

22.    Upon information and belief, Bolt Rx is one of the many suppliers of Medicare data that facilitate the fraudulent DME scheme described below.

23.    Defendant Double Down Data LLC ("Douhle Down") is a New Hampshire corporation with a registered address of 179 Pine Street, Manchester, NH 03102.

24.    Defendant Anthony Miscioscia is the CEO of Double Down. Double Down was incorporated in 2018 and has not been in good standing since March 8, 2020, but Mr. Miscioscia still lists himself as the company's CEO.

25.     Upon information and belief, Double Down is one of the many suppliers of Medicare data that facilitate the fraudulent DME scheme described below.

26.     Defendant All Elite Medical Supplies LLC ("All Elite") is a Florida corporation owned by Defendant Mario Georgatos with the head office at 2300 Palm Beach Lakes Boulevard, Suite 219, West Palm Beach, FL 33409, and the agent's address at 5575 S. Semoran Boulevard, Orlando, FL 32822.

27.     At the time Relator was working for All Elite, the suite number for the office was #204 at the same address.

28.     As described in greater detail below, All Elite operates the call center at which telemarketers (such as Relator) sell unnecessary DME to Medicare patients using the Medicare data provided to them.

29.     Relator believes she was employed by All Elite but her paycheck came from All Elite Medical LLC.

30.     All Elite Medical LLC is a seemingly non-existent company that Relator's paycheck claimed was located at 2730 South Ocean Boulevard #711, Palm Beach, FL 33480, a private residence.

31.     Relator believes Defendant All Elite directly employed approximately 20-30 employees while she was there but that this number has ballooned to over 50. Most of these employees are telemarketers who call Medicare beneficiaries to aggressively push a variety of medical products, based on

Medicare beneficiary information received from a number of third-party telemarketing companies.

32.     Defendant Realtime Physicians LLC (a.k.a. 24hr Virtual MD) ("RTP") is a telehealth physician service incorporated in Nevada with a business location at 701 Park of Commerce Boulevard, Suite 301, Boca Raton, FL 33487-3604 and headquarters at 871 Coronado Center Dr STE 200, Henderson, NV 89052-3977.

33.     RTP provides the doctors who sign off on the medically unnecessary DME prescriptions that All Elite peddles to unsuspecting seniors.

34.     Relator Amberly Lustgarten ("Relator") worked for All Elite Medical as a telemarketer who followed All Elite's script and instructions to secure unnecessary DME prescriptions for Medicare patients.

35.     Relator only worked for All Elite for approximately two weeks ending on January 15, 2021 as she swiftly realized that the entire operation was fraudulent.

36.     There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein because Relator has direct and independent knowledge of the information on which the allegations in this Complaint are based.

37.    As required pursuant to 31 U.S.C. § 3730(e), Relators have voluntarily disclosed to the Government the facts on which the allegations in this Complaint are based prior to filing this action.

38.    As required by 31 U.S.C. § 3730(b), Relator will serve upon the Attorney General of the United States and the United States Attorney for the Southern District of Florida, contemporaneously with the filing of this action, a copy of the complaint and written disclosure of substantially all material evidence and information Relator possesses.

## FACTUAL ALLEGATIONS

39.    As described below, Defendants work together to operate a scheme targeting elderly and vulnerable patients that has caused the submission of millions of dollars in false claims to Medicare. This scheme involves using high pressure sales calls, fake medical personnel, and edited recordings to dole out unnecessary DME to the unsuspecting elderly.

40.    All Elite had its telemarketers follow a script for their sales calls.

41.    The scheme operates as follows. First, upon information and belief, Defendants Bolt Rx, Double Down funnel Medicare data to Defendant All Elite so that it can start scamming Medicare patients into receiving unnecessary DME, namely braces for the back, knees, shoulders, wrists, and ankles.

42.     Bolt Rx then pays All Elite for each DME order that results in an actual payment from Medicare.

43.     All Elite pays the telemarketers up front for a closed transaction but Medicare does not pay its providers for 14 days.

44.     Thus, if a telemarketer closes a DME "sale" to a Medicare patient for which Medicare does not pay, All Elite's owner, Mario Georgatos, claws back the commission from the telemarketer.

45.     When Sean Dougherty from Bolt Rx was slated to arrive at All Elite's operation, Mr. Georgatos would insist that everyone be on their "best behavior" (meaning no telemarketers on their personal phones or otherwise not soliciting business).  Mr. Georgatos would tell the telemarketers that Sean "doesn't want to lose money or go to jail"—he wants to see people making sales.

46.     Mr. Georgatos frequently offers cash incentives for the next telemarketers whose calls resulted in "good deals."

47.     Relator believes that Defendant Bolt Rx also works with Defendant RTP to secure the medical orders for the unnecessary DME that All Elite pushes on Medicare patients.

48.     To this end, RTP maintains a list of states in which the RTP physicians do not interact with patients at all and just sign the fraudulent prescriptions.

RTP refers to these as "good states." Good states are considered to be the following:

- Florida
- Georgia
- Illinois
- Kentucky
- Maryland
- Minnesota
- Mississippi
- Nebraska
- North Carolina
- Ohio
- South Carolina
- Tennessee
- Virginia
- West Virginia
- Wyoming
- Wisconsin

49.    "Bad states" are those where the RTP physicians insist on interacting with the patient before signing the prescription for the braces, and so All Elite did not market to patients in those states.

50.    Since All Elite only allows its telemarketers to complete calls to patients in the "good states," none of the prescriptions for braces result from a situation where the prescribing physicians interact with the patients directly.

51.    Upon information and belief, none of the All Elite employees is a health care professional.

52.    Instead, they are all simply telemarketers operating from a script and instructions that All Elite provides to them.

53.    The next step in the fraudulent scheme is the initial telemarketer (referred to as the "opener") logs into the automatic patient dialer (at www.aem.clients.dialer referred to as the "VICI dialer" after the website https://www.vicidial.com), which dials patients whose numbers had been previously loaded into the system via the Medicare data supplier.

54.    Once someone actually answers the call, the VICI screen shows the patient's name and address.

55.    If the patient is in a so-called "bad state," Mario Georgatos (the head of All Elite) instructs the telemarketers to immediately hang up on the patient.

56.    If the patient is in a so-called "good state," the telemarketer proceeds to run Episode Alert, a Medicare Eligibility Verification System, on the patient to determine whether the patient qualifies for the braces All Elite was poised to foist on them.

57.    For instance, if Episode Alert revealed that the patient was receiving home health or hospice care or was at a nursing home, All Elite instructs the telemarketers to hang up on that patient.

58.    All Elite has its telemarketers continue with calls to Medicare patients in the "good states" because it is easier to push the prescriptions through in those states, given the lack of physician contact required.

59.     All Elite provides its employees with a script for these calls, which they use to convince Medicare patients that they need the DME at issue and instructs them how to pressure patients to get to the correct answers to the scripted questions.

60.     Another step in the process is determining whether a patient had already received a back brace in the past year because Relator was told that patients could not receive two of the same braces in a year.

61.     To determine this, Mr. Georgatos instructs the telemarketers to send him a Skype message immediately after the telemarketer got the patient on the call with the patient's date of birth and address.

62.     The purpose of this exercise is to determine whether patient is currently eligible for a brace, as Mr. Georgatos has some way of determining whether the patient had already received a brace in the past year.  There are several possible responses: (1) "good back and both knees," means the telemarketer can proceed to the next step; (2) "no—it's a dupe," means that the patient had already received a brace in the past year and (3) "in three months," means that the patient will be ready for a brace in three months.

63.     All Elite instructs its telemarketers to open their calls by falsely telling the patients that they were calling about a Medicare assessment that was past due.

64.     To this end, telemarketers claim that the patient should have received paperwork from CMS relating to the "Preventative Care Act" regarding the patients getting braces to prevent future harm—such as unnecessary surgeries and possible opioid addiction.

65.     When the Medicare patient tells the telemarketer that they had not yet received this fictional letter, the telemarketers assuage them by saying that they had not received it because the Covid pandemic had messed up everyone's mail.

66.     This would provide a segue for the telemarketer to continue with something like "now that I have you on the phone, it is required that you get a brace as a preventative measure to lessen the chance of surgery or opioid addiction.'"

67.     If the patient still refuses the braces, All Elite instructs its telemarketers to try to scare the patient into accepting the braces by falsely claiming that any refusal would be noted in the patient's file.

68.     This refusal notation, the telemarketers claim, means the patient would not be able to get surgery on the affected area covered by Medicare in the future because the patient rejected the brace as part of the so-called "preventative care."

69.     These tactics are designed to fool patients into thinking a legitimate operation is calling them and to prey on the elderly's fear of losing Medicare benefits to peddle its unnecessary braces.

70.     As a result, most patients believe them and then give the telemarketers their Medicare number when asked.

71.     The telemarketers then ask the patients whether they have a secondary type of insurance, but All Elite instructs its telemarketers to "always put a no" regardless of the patient's response (presumably so all payments could come from Medicare).

72.     The next step in the process is that the telemarketer/opener tells the patient that a "nurse" is going to come on the line and ask which braces the patient wants to choose as part of a fraudulent "medical assessment."

73.     Though the telemarketers represent that the next person who comes on the line will be a nurse, this person was in fact just another All Elite employee impersonating a nurse, such as Mr. Georgatos's girlfriend.

74.     During this "medical assessment," All Elite instructs its fake nurses to ask patients about their areas of pain (which All Elite referred to as "AOP") as well as to ask "pain triage questions."

75.     For the patient's AOP, All Elite's goal is to get the Medicare patients braces for their back and both knees.

76.     This is because Medicare only pays for three braces at a time and the back and knee braces are the most expensive.

77.     The All Elite script also states that: (1) the primary braces are "back, bi knees, bi wrists" (bi meaning "both"); (2) "add-on" braces are for shoulders and ankles; (3) they cannot "do a deal" with only add-on braces or only wrist braces because Medicare does not allow this; and (4) if a patient wants both shoulder and wrist braces, All Elite instructs that they must prescribe the patient "opposite shoulder and wrist."

78.     To get patients to agree to these particular braces, the fake nurse gives a false rationale to any patient with an AOP in somewhere other than their back and knees.

79.     For example, if a patient says their AOP was in the neck, the fake nurse responds that what Medicare requires them to send out to the patient right now (per the aforementioned "Preventative Care Act") is braces for back and both knees.

80.     The fake nurse then assures the patient that she will "mark down" the patient's neck pain so that the patient can receive a neck brace at a later time (which never happens).

81.     The fake nurses assure patients anything prescribed as a result of the call would be at no cost to them, regardless of whether an applicable patient co-pay exists.

82.     However, Episode Alert usually reflects that the patient has a $203 deductible, which ultimately affects how much Medicare will pay down the line.

83.     As for the "pain triage" questions, they consist of the fake nurse asking the patient what their level of pain was on a scale of 1-10 and are instructed to coach the patient to get to a pain level between 5 and 10.

84.     The way the fake nurses do this is as follows: if a patient says that her pain level is lower than a 5 (*e.g.* telling the fake nurse that it's not so bad, just a bit of discomfort in the morning), the fake nurse coaches the patient to get the pain score up so that the patient responds appropriately during the next stage in the process. An example of this coaching is as follows: "but what you're feeling doesn't necessarily have to be 'pain'—do you ever experience any discomfort anywhere? It doesn't have to be constant—I mean, I know my knees pop in the morning. So let's rank that discomfort on a scale of 5 to 10."

85.     Up until this point, none of the phone conversation has been recorded.

86.     Thus, the next stage of the process is All Elite creating a recording of their conversation with the patient that is meant to sound like the first interaction between the parties.

87.     Before the recording starts, the fake nurse informs the patient that they are almost finished but that: (1) "for your protection" they will now put everything on recording, (2) the recording will sound like a new call where

the fake nurse who was just talking to the patient will introduce herself (or in the case of a different person "closing" the call, would tell the patient that another person will get on and confirm all of the information); (3) the patient should remember his/her pain score and that the pain scale would be presented as 1-10 but they should answer between 5 and 10 and (usually) that the patient was receiving a brace for the back and both knees.

88.     The fake nurse then tells the patient to make sure to say goodbye at the end of the recording but to not hang up because someone from the shipping department is going to get on the line afterwards.

89.     The fake nurse then asks if the patient has any questions and states again that they will now be starting the recording, which will sound like a new call.

90.     This person could either be the same telemarketer who was the "opener," the fake nurse, or a separate telemarketer who functioned as the "closer." After the recording starts, the closer falsely identifies herself as a nurse working for Bolt Rx.

91.     Although the initial part of the call with the patient could sometimes last close to an hour, the second stage of the call that was recorded would usually last less than 10 minutes.

92.     This is because the recorded stage of the call is just the fake nurse walking the patient through their pain scale and the braces they supposedly requested.

93.     Once the closer completes the recording, she sends the information about what the patient ordered to the All Elite employee who edits the patient recording (per the closer's instructions) to make it sound seamless.

94.     For instance, if the patient resists the prior coaching attempts and says they have no pain on the recording, the closer coaches the patient until they say they had pain and want braces for "back and both knees," and the All Elite recording editor "chops" the offending part of the recording.

95.     After the closer is done with her part of the recording, All Elite instructs her to tell the patient that "someone from RTP may reach out to you," and to ask when is the best time for RTP to reach you.

96.     All Elite is also adamant that the telemarketers must say goodbye and hear a "goodbye" from the patient before ending the recording. After the recording ends, the closer tells the patient that they are done with the recording and tells the patient that someone is coming on from the "shipping department" of the company that is sending the braces, which is called a "Welcome Call."

97.     This person is, in fact, yet another All Elite employee who verifies the patient's address and that the patient wants braces for "back and both knees" (in the usual case).

98.     The call would go something like this: "Hi I'm here packing up your braces. Your address is [X]—confirm? I have that you are receiving braces for your back and both knees, is that correct? Wonderful. It should be there in about three to five days.  You have a nice day now. Goodbye!"

99.     After the telemarketers complete the DME sale, Mr. Georgatos instructs them to send him a second Skype message confirming that the deal is done.

100.   Relator believes that, in almost all instances, the DME products that Defendants scammed the Medicare patients into accepting were not medically necessary and reasonable.

101.   Instead, the DME prescriptions are just the result of All Elite coaching Medicare patients into providing the "correct" responses to questions that could be cut and pasted into a recording that sounds legitimate.

102.   Moreover, prescriptions are not medically necessary and reasonable if the provider who orders the DME does not properly examine the patient to make that determination.

103.   Every claim submitted to Medicare for DME that is not medically necessary and reasonable is false.

104.   Every edited audio recording is a false record or statement material to the resulting claim for DME.

105.   Defendants are jointly and severally liable for the damages to the Government because they all participated in the scheme to defraud Medicare by (a) providing patient data, (b) marketing the DME, and (c) signing the prescriptions, respectively.

## COUNT I
## VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FALSE CLAIMS ACT
### (All Defendants)

106.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

107.   As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

108.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

109.   As set forth above, Defendants knowingly conspired to commit violations of the False Claims Act in violation of 31 U.S.C. § 3729(a)(1)(C).

110.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

111.   Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

### PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States treble damages sustained for each of the false claims;

(b) awarding the United States a maximum civil penalty for each of the false claims, records, and statements;

(c) awarding Relator the maximum share of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relator litigation costs and reasonable attorneys' fees; and

(e) granting such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

T. David Hoyle
Florida Bar No.: 55006
Motley Rice LLC

-23-

28 Bridgeside Blvd.
Mount Pleasant, SC  29464
(843) 216-9000
(843) 216-9450 Facsimile
dhoyle@motleyrice.com

Anna C. Dover (*applying for pro hac vice*)
New York Registration No. 4396909
**Bracker & Marcus LLC**
11 Broadway, Suite 615
New York, NY 10004
Telephone: (646) 448-5253
Facsimile: (678) 648-5544
Anna@FCAcounsel.com